IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH STEVENS,<br><br>   Plaintiff,<br>   v.<br><br>COUNTY OF SAN MATEO, et al.,<br><br>   Defendants. | No. C 04-02762 SI<br><br>**ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING CASE** |

On March 3, 2006, the Court heard argument on defendant's motion for summary judgment. Having considered the arguments of counsel and the papers submitted, and for good cause appearing, the Court GRANTS IN PART defendant's motion. The Court further declines to exercise supplemental jurisdiction over the remaining claim and therefore DISMISSES this action for lack of jurisdiction.

**BACKGROUND**

Plaintiff Keith Stevens is a 53-year-old African American male. Silberman Decl., Exh. 1 at 12 (Stevens deposition). From 1992 to 2005 he was employed by defendant San Mateo County as a Group Counselor in its juvenile probation department. Stevens Decl., ¶¶ 3, 47. In 2004, Stevens filed this complaint against San Mateo county, alleging that he had been discriminated against based upon his race and age and that he had been wrongfully denied leave under California and federal family leave acts.

The majority of Stevens's allegations stem from his difficult working relationship with Vincent Obiajulu, an African-born man seven years Stevens's junior. During 2001 and 2002, Stevens and Obiajulu worked together on the 11 p.m. to 7 a.m. shift, known as the "graveyard shift," at Camp Glenwood, a minimum security County facility that houses between 55 and 60 boys that have become wards of the Superior Court because they have committed crimes. Peterson Decl., ¶¶ 2, 4; Stevens Decl., ¶¶ 8, 12, 16. Both men were charged with monitoring approximately half the wards while they

slept. Peterson Decl., ¶ 4. They sat in separate offices, approximately 20 yards apart, adjacent to the dorms they were charged with monitoring. *Id.* The record makes clear that Stevens and Obiajulu did not like each other, and on at least one occasion Obiajulu said one somewhat threatening remark to Stevens.[1]

On April 10, 2002, the tension between Stevens and Obiajulu boiled over. At approximately 6 a.m., Stevens phoned Obiajulu to request that Obiajulu cover for him while he took a break. Stevens Decl., ¶¶ 22-23; *see also* Peterson Decl., Exh. B; Silberman Decl., Exh. 1 at 204-06. When Obiajulu did not pick up the phone, Stevens walked over to Obiajulu's office. Stevens Decl., ¶ 22. The precise details of what followed are unclear. *See* Stevens Decl., Exh. H (Sheriff's report describing conflicting accounts of altercation); Peterson Decl., Exh. B. The end result, however, was that Stevens suffered a broken wrist, apparently from having Obiajulu's door pushed into him while he was trying to unlock it. Stevens Decl., ¶ 24. Following the altercation, Obiajulu called the Sheriff. Silberman Decl., Exh. B.

Due to his injury, Stevens was placed on disability through July 2002. Peterson Decl., Exh. G. When plaintiff returned to work, his doctors instructed him to return only to "light duty" while his injuries healed. Silberman Decl., Exh. 1 at 223-226 (Stevens Depo.). Specifically, Stevens was instructed not to be put in a position that might require him to restrain minors. *Id.* at 225. Stevens was transferred to Hillcrest Juvenile Hall, and was assigned was to the admissions division. Peterson Decl., ¶ 13. He worked in an office known as the "bubble" because of its large windows. *Id.* at ¶ 13 & Exh. G.

On July 22, 2002, the day Stevens returned to work, he met with Stewart Peterson, Deputy Chief of Institution of the Probation Department. Peterson Decl., ¶ 11 & Exh. G. Peterson explained that both Stevens and Obiajulu were going to be transferred off the graveyard shift for a period of four to six months so they could be subject to closer supervision. Peterson Decl., Exh. G. Peterson also explained that this probationary period would not start until Stevens returned to regular duty. *Id.* Finally, Peterson explained that if Stevens's performance was acceptable during the probationary period, he would be

---

[1]The precise remark was to the effect of "you are an old lion and in my country we kill old lions." Stevens Decl., ¶ 14.

2

1 eligible to return to the graveyard shift. *Id.* Stevens began working at Hillcrest on July 23, 2002, and
2 came off of light duty on January 15, 2003. Peterson Decl., ¶ 16. Obiajulu remained at Glenwood, and
3 continued working the graveyard shift until August 3, 2002. Peterson Decl., ¶ 12. At that time, he was
4 transferred off the graveyard shift and has not returned since. *Id.*

5 At the end of September 2002, Stevens's daughter attempted suicide. Stevens Decl., ¶ 37. On
6 October 2, 2002, Stevens requested family leave to care for his daughter. Peterson Decl., Exh. H. In
7 response, Peterson wrote him a memo outlining the requirements for family leave. *Id.* Stevens
8 submitted the required certification from his daughter's medical provider, but failed to fill out and
9 submit the internal "Leaves of Absence Request Form." *Id.* at ¶ 15; Stevens Decl., Exh. S. His request
10 was therefore never processed. Stevens nevertheless took about ten days of unpaid leave between
11 October and December 2002, when his daughter ran away from home. When he came off light duty on
12 January 15, 2003, Stevens requested to be put on the graveyard shift so he could have time to deal with
13 his daughter. Stevens Decl., ¶ 39. That request was refused because Stevens had not completed his four
14 to six month probationary period. Peterson Decl., ¶ 16. It appears that Stevens also requested family
15 leave in 2003 and 2004, but the precise circumstances of the requests are unclear. *See* Stevens Decl.,
16 ¶¶ 43-47. These later requests are not included in his second amended complaint.

17 On May 2, 2003, Stevens filed his complaint with the Equal Employment Opportunity
18 Commission ("EEOC") and the California Department of Fair Employment and Housing ("DFEH").
19 Stevens received his right-to-sue letter from DFEH on May 8, 2003, and from the EEOC on April 19,
20 2004. This lawsuit followed.

21 Defendant now moves for summary judgment, arguing that plaintiff's evidence does not
22 establish a violation of any civil rights law or family leave act. With the exception of Stevens's claim
23 for violation of the California family leave statute, the Court agrees.

**LEGAL STANDARD**

**I.   Summary Judgment**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

3

material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only point out to the Court that there is an absence of evidence to support the non-moving party's case. *See id.* at 325.

The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a motion for summary judgment, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when she] is ruling on a motion for summary judgment." *Id.*

## II.   Hostile Work Environment

"To prevail on a hostile workplace claim . . . a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a racial or [age-based] nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. City of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). To determine whether conduct was sufficiently severe or pervasive to warrant liability, courts look at "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Clark County*

4

*Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71, 121 S. Ct. 1508 (2001). In addition, "[t]he working environment must both subjectively and objectively be perceived as abusive." *Id.*

### III. Retaliation and Discrimination

Under both Title VII and FEHA, courts employ a burden shifting framework when evaluating claims of retaliation and disparate treatment. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (disparate treatment under Title VII); *Guz v. Bechtel National, Inc.*, 24 Cal. 4th 317, 354 (2000) (disparate treatment under FEHA); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002) (retaliation under Title VII); *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005) (retaliation under FEHA). This burden shifting works as follows:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Burdine*, 450 U.S. at 252-53 (internal citations and quotation marks omitted). Although the burden shifting framework is the same, the prima facie case that plaintiff must prove differs slightly between disparate treatment claims and retaliation claims.

### IV. Family Leave Acts

The Family and Medical Leave Act ("FMLA") provides job security to employees who must be absent from work because of their own illnesses, to care for family members who are ill, or to care for new babies. 29 U.S.C. § 2612. Under the FMLA, employees are entitled to take up to twelve weeks of leave each year and are guaranteed reinstatement after exercising their leave rights. *Id.* It is unlawful for an employer to interfere with, restrain, or deny an employee's exercise of FMLA rights. 29 U.S.C. § 2615(a)(1)-(2). The employer bears the responsibility of determining whether an employee's leave request is covered by the FMLA. 29 C.F.R. § 825.208(a) (2001). The California Family Rights Act ("CFRA") is generally similar to the FMLA. *See* Cal. Gov't Code § 12945.2.

///

**DISCUSSION**

Stevens brought state and federal claims for: 1) hostile work environment; 2) retaliation; 3) disparate treatment based on age and race; and 4) violation of family leave acts. The Court considers each in turn.

**I.   Hostile Work Environment**

Plaintiff alleges that he was subjected to a hostile work environment based on both his age and his race. He has introduced evidence showing that he was subjected to a number of inappropriate comments from 2001 to 2003.

**A.   Continuing Violation Doctrine**

As an initial matter, the parties dispute what evidence the Court may consider. In discrimination cases generally, a court may only consider evidence of discriminatory acts that occurred within a year of a plaintiff's EEOC complaint. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110-114, 122 S. Ct. 2061, 2071-73 (2002). Because plaintiff filed his EEOC complaint on May 2, 2003, defendant argues that the Court may only consider acts that occurred after May 2, 2002.

In hostile work environment claims, however, a court may consider prior acts of harassment, provided that an act contributing to the claim occurred within the filing period. *Id.* at 117, 122 S. Ct. at 2074 (2002) ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."). Here, as discussed below, plaintiff has alleged that he was subject to age- and race-based harassment during the fall and winter of 2002. That is sufficient for the Court to consider evidence of harassment that occurred before the limitations period. *See id.* at 118, 122 S. Ct. at 2075 (rejecting position of some circuits that a plaintiff "may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct").

### B. Plaintiff's Evidence

Plaintiff's evidence fails to establish that he was subjected to unwelcome conduct that was sufficiently severe and pervasive to warrant liability. Stevens bases his hostile work environment claims on a number of age- and race-based comments he received between late 2001 and early 2003. With one exception, the comments Stevens received are isolated and do not appear to be part of a larger pattern. For example, in August 2001, Edward Hopida, a non-permanent group supervisor at the juvenile facility, called Stevens an "old barking dog." Stevens Decl., ¶ 10; *see also* LaGarde Decl., Exh. 4 at 64 (Calhoun deposition). In October 2001, Obiajulu called Stevens a "stupid old man making up rules." Stevens Decl., ¶ 13. In January 2002, Obiajulu said to Stevens "You are an old lion and in my country we kill old lions." *Id.* at ¶ 14. In March 2002, Stevens learned that another employee had said of him that he was a "stupid old man who might tweak at any time." *Id.* at ¶ 21. Finally, Stevens testified in his deposition that the was called "OG," which he contends means "Old Gangster,"[2] at Hillcrest. Silberman Decl., Exh. 1 at 433-34. Stevens testified that the use of "OG" occurred approximately 20-50 times from August 2002 to early 2003, when Stevens's coworkers learned his name and stopped using the acronym.[3] *Id.* In addition to the age-based comments, Stevens also alleges that he was subjected

---

[2] Although Stevens now claims "OG" means "Old Gangster," at his deposition he testified that he believed it meant "Old Guy." *See* Silberman Decl, Exh 1 at 431-32 (Stevens Depo.). This change is one of a number of significant changes in Stevens's account of his employment conditions during this case. For example, Stevens originally failed to disclose any harassment that occurred after April 10, 2002. Silberman Decl., Exh. 11 (responses to interrogatories). Only after his original complaint was dismissed because his allegations were time-barred did Stevens begin to assert that he was called "OG" during the latter part of 2002 and 2003

More troubling are the portions of Stevens's deposition testimony that flatly contradict his declaration. Stevens originally testified that he was called "OG" from August 2002 to 2003, and that the employees stopped using it when they learned his name. Silberman Decl., Exh. 1 at 433-34. In his declaration, however, Stevens states that the use of "OG" continued until he retired, and that the other employees were using it even after they learned his name. Stevens Decl., ¶ 34. In addition, Stevens unequivocally testified at his deposition that no acts of race discrimination occurred after May 2, 2002. Silberman Decl., Exh. 1 at 435. Yet in his declaration, he now asserts that "OG" has racial overtones that he finds offensive. Stevens Decl., ¶ 34.

[3] In his declaration, Stevens states that Obiajulu called him "stupid old man," and "stupid" almost every time they worked together. Stevens Decl., ¶ 16. This is directly contradictory to Stevens's deposition testimony, in which he very clearly testified that he was only called "old" to his face a total of four times. Silberman Reply Decl., Exh. CC. Given this blatant discrepancy, the Court will adhere to what Stevens testified to at deposition, and SUSTAINS defendant's objection to plaintiff's declaration. *See Hambleton Bros. Lumber Co. v. Balkin Enters., Inc.*, 397 F.3d 1217, 1224-25 (9th Cir. 2005).

7

to race-base harassment. In January 2002, when Stevens caught Hopida sleeping, Hopida said, "you're my nigger" to him a number of times. Stevens Decl., ¶ 15. In addition, Stevens claims that "OG" has racial overtones connecting blacks to violence and drugs. *Id.* at ¶ 34.

These incidents are neither sufficiently severe nor pervasive to constitute an actionable hostile work environment claim. The incidents Stevens relies on were sporadic and isolated, and not the type of conduct that can be said to have "permeated" Stevens's workplace. *See Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) ("In order to prevail on her hostile work environment claim, Brooks must show that her 'workplace [was] permeated with discriminatory intimidation . . . that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'") (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993)) (alterations in original). "[F]requency, severity and level of interference with work performance among the factors particularly relevant to the inquiry." *Id.* at 924. Even Stevens, however, believes that the only continuing conduct that he relies on – the use of "OG" for approximately five months – occurred simply because his coworkers did not know his name. Such conduct is not sufficiently abusive to support a hostile work environment claim.

Stevens's evidence, standing alone, establishes only the sort of isolated, sporadic incidents that courts have repeatedly rejected as the basis for a hostile work environment claim. *See Vasquez*, 349 F.3d at 642-44 (describing nature of severity and pervasiveness needed for hostile work environment claim). Indeed, the purported harassment in this case is qualitatively different from that described in cases which have found a hostile work environment. For example, in *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864 (9th Cir. 2001), the Ninth Circuit described the harassment as follows:

> Sanchez was subjected to a relentless campaign of insults, name-calling, and vulgarities. Male co-workers and a supervisor repeatedly referred to Sanchez in Spanish and English as "she" and "her." Male co-workers mocked Sanchez for walking and carrying his serving tray "like a woman," and taunted him in Spanish and English as, among other things, a "faggot" and a "fucking female whore." The remarks were not stray or isolated. Rather, the abuse occurred at least once a week and often several times a day.

*Id.* at 870; *see also Vasquez*, 349 F.3d at 642-44.

Here, in contrast, plaintiff was simply referred to as "OG," a term that he admits he did not know the meaning of. Further, plaintiff has provided no evidence that the conduct was abusive; indeed,

8

plaintiff testified that the conduct stopped once his new coworkers learned his name.

Plaintiff has failed to provide evidence of any conduct that was sufficiently severe or pervasive to create a hostile working environment. Accordingly, the Court GRANTS defendant's motion summary judgment with respect to those claims.

## II.  Retaliation

Stevens also claims that he was retaliated against for engaging in protected activity. In order to establish a *prima facie* case of retaliation, Stevens must demonstrate that "(1) [he] had engaged in protected activity; (2) [he] was thereafter subjected by [his] employer to an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action." *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005). Because federal and state law differ on the application of the continuing violations doctrine to retaliation claims, the Court will consider Stevens's claims under each law separately. *See National R.R.*, 536 U.S. at 114-15, 122 S. Ct. at 2073; *compare Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1057 (Cal. 2005) (refusing to adopt *Morgan* and applying continuing violations doctrine to retaliation action).

### A.  Federal Law: Actions Within Limitations Period

Under federal law, because retaliatory actions constitute discrete occurrences of discrimination, Stevens may only recover for retaliation that occurred within the statutory period. *See National R.R.*, 536 U.S. at 114-15, 122 S. Ct. at 2073. Stevens claims that he engaged in protected activities that resulted in four adverse employment actions. Two of these actions occurred within the statutory period.

#### 1.  Plaintiff's Transfer to Hillcrest

Stevens claims that he engaged in protected activity in early 2002, which led to his eventual transfer to Hillcrest in the summer of 2002. Specifically, Stevens claims that he reported a number of offensive comments to management in January 2002. Such comments included complaining about being called "stupid old man" by Obiajulu, complaining about being called an "old lion" by Obiajulu,

9

1 and being called a "nigger" by Hopida.[4] Stevens argues that he was transferred to Hillcrest in July 2002
2 in retaliation for his complaints.[5]

3       The Court finds that plaintiff has not provided adequate evidence of a causal link between the
4 transfer and any protected activity. Plaintiff alleges that his transfer was in retaliation for complaints
5 he made in January, but he admits that he was not transferred until May, at the earliest. Further, plaintiff
6 has produced no evidence that the person who made the transfer decision knew about his protected
7 activity. *See* Peterson Decl., ¶ 22. The causal connection is further reduced by the altercation between
8 Obiajulu and Stevens, a significant intervening event. Given that there are no other allegations of
9 protected activity in the interim, the Court finds that four months is too far removed to establish a causal
10 connection in this case. *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S. Ct. 1508,
11 1511 (2001) (holding that temporal proximity between protected activity and adverse action must be
12 "very close," and citing with approval cases in which three- and four-month periods were deemed
13 insufficient).

14       Even assuming plaintiff's evidence establishes a prima facie case, the Court finds that defendant
15 has established that there was a legitimate reason for plaintiff's transfer. After the altercation with
16 Obiajulu, plaintiff was placed on disability until July 2002. Peterson Decl., Exh. G. When plaintiff
17 returned to work, his doctors instructed him to return only to "light duty" while his injuries healed.
18 Silberman Decl., Exh. 1 at 223-226. Specifically, Stevens was instructed not to be put in a position that
19 might require him to restrain minors. *Id.* at 225; Peterson Decl., ¶ 12. The only such position was at
20 Hillcrest. Peterson Decl., ¶ 12.

21       Stevens has not provided sufficient evidence to establish that this reason was pretextual. The
22 only evidence he offers is the fact that he was never transferred back to Glenwood. But Stevens has
23 offered no evidence – and has not even argued – that he requested transfer back to Glenwood. Rather,

---

[4]Stevens also claims that he brought a number of other complaints to management's attention during this time frame, such as Obiajulu's refusal to cover for him during the graveyard shift. Such complaints do not constitute protected activity because they did not involve any protected classification.

[5]The precise date on which the transfer decision was made is a matter of some dispute. Defendant argues that the transfer did not occur until July 22, 2002, the date of Stevens's meeting with Peterson. Plaintiff, however, has introduced some evidence implying that the decision was made as early as May 2002. Scott Decl., ¶ 6.

10

Stevens's declaration makes clear that he requested a transfer to graveyard shifts, regardless of the location. *See* Stevens Decl., ¶¶ 36-39, 45. Accordingly, the Court finds that Stevens has not provided adequate evidence to prove that his transfer to Hillcrest was pretextual.

### 2. Denial of Plaintiff's Request for Family Leave

The other adverse employment action plaintiff alleges he suffered was the denial of his request for family leave and shift adjustments in October 2002 and January 2003.[6] Again, plaintiff has not made out a *prima facie* case of retaliation. Specifically, plaintiff has not established that there was any causal connection between the complaints he made and the denial of his requests. And the incidents are not closely related enough in time to justify an inference of causation. *See, e.g.*, *Manett v. Bank of America*, 339 F.3d 792, 802 (9th Cir. 2003) ("While courts may infer causation based on the 'proximity in time between the protected action and the allegedly retaliatory employment decision,' such an inference is not possible in this case because approximately nine months lapsed between the date of Manatt's complaint and the Bank's alleged adverse decisions."); *see also Breeden*, 532 U.S. at 273-74, 121 S. Ct. at 1511.

Plaintiff argues that the denial of shift adjustments should be considered an extension of his transfer. But, as discussed above, Stevens has not produced sufficient evidence to establish that his transfer was in retaliation for a protected activity. Thus, the Court finds that Stevens has not produced sufficient evidence in support of his assertion that the denial of his requests for shift adjustments was a retaliatory action.

### B. California Law: Continuing Violation

Under California law, the continuing violation doctrine can apply to retaliation actions in certain

---

[6] As defendant points out, this allegation is interesting given that Stevens testified at deposition that he did not believe the denial of his request for family leave in 2002 was on account of his age or race. Silberman Decl., Exh. 1 at 55-56, 302.

11

1 circumstances.[7] *See Yanowitz*, 36 Cal.4th at 1056. In determining whether the continuing violation
2 doctrine should apply, a court should consider whether "the employer's actions were (1) sufficiently
3 similar in kind -- recognizing . . . that similar kinds of unlawful employer conduct, such as acts of
4 harassment or failures to reasonably accommodate disability, may take a number of different forms; (2)
5 have occurred with reasonable frequency; and (3) have not acquired a degree of permanence." *Richards*
6 *v. CH2M Hill, Inc.*, 26 Cal. 4th 798, 823 (2001). Stevens has not established that the continuing
7 violations doctrine should apply to his case.

8 Stevens alleges that he was subjected to a continuing course of retaliatory actions from the fall
9 of 2001 through January 2003.[8] Specifically, Stevens argues that he suffered four adverse employment
10 actions as a result of his complaints about the inappropriate comments discussed above: he was stripped
11 of his lead position in 2001; he was denied overtime from October 2001 to April 2002; he was
12 transferred to Hillcrest in July 2002; and he was denied schedule adjustments to care for his daughter
13 from the fall of 2002 on.

14 With one exception, the record confirms that the above employment actions occurred. For
15 example, it appears that up until November 2001, plaintiff held the "lead position" on the graveyard
16 shift.[9] *See, e.g.*, Stevens Decl., ¶ 4 & Exh. A. Plaintiff's supervisors have testified that this lead position
17 was taken away from him sometime in late 2001. LaGarde Decl., Exh. 2 at 53, 104 (Peterson
18 deposition); LaGarde Decl., Exh. 2 at 37 (Crandall deposition). Plaintiff has introduced no evidence
19 as to how his job changed as a result of this action. *Cf.* LaGarde Decl., Exh. 7 at 18 (testimony that staff

---

[7]Stevens's argument that the continuing violations doctrine applies to his retaliation claim was based solely on federal law. Thus, defendant has had no opportunity to address whether *Yanowitz* should apply.

[8]In his interrogatory answers, Stevens identified only one instance in which he engaged in statutorily protected activity: a complaint he made on January 28, 2002, about inappropriate comments made by his coworkers. Silberman Decl., Exh. 5. In his deposition, however, Stevens testified that he believed he was stripped of his lead position because he complained. Silberman Decl., Exh. 1 at 92-93. The Court will therefore consider Stevens's claim that he was stripped of his lead position because he complained of inappropriate comments.

[9]The record on this point is extremely sparse. Indeed, aside from passing references to Stevens's "lead" role, the record does not reflect that Stevens held a lead position in any formal capacity. *See, e.g.*, Stevens Decl., Exh. A. Stevens's supervisors, however, have testified that he was considered the lead on the graveyard shift.

12

1 who worked on the graveyard shift were to follow Stevens's instructions). One of his supervisors, 2 however, testified that while his employment benefits remained the same, his responsibilities changed 3 somewhat. LaGarde Decl., Exh. 7 at 37 (testimony that removal of lead position was not a demotion but 4 affected Stevens's duties and responsibilities). In addition to evidence supporting Stevens's allegations 5 with respect to his lead position, the record also establishes that Stevens was transferred in April 2002, 6 and that he was denied family leave or a shift adjustment in October 2002 and January 2003. *See* 7 Peterson Decl., ¶¶ 12-13, 15-16.

8 Stevens's allegations that he was denied overtime, however, are contradicted by the record. 9 Stevens alleges in a short paragraph of his declaration that he had worked enough overtime to earn an 10 extra $1,000 per month prior to the time he started complaining, and that from October 2001 to April 11 2002 he was only allowed to work overtime twice. Stevens Decl., Exh. 20. Defendant, however, has 12 produced documents showing that Stevens actually worked overtime numerous times from October 13 2001 to April 2002. Silberman Reply Decl., Exh. DD. These documents show that Stevens worked 16 14 hours of overtime in October 2001, 11 hours of overtime in December 2001, 27.5 hours of overtime in 15 January 2002, and 32 hours of overtime in February 2002.[10] Given these detailed records, and the lack 16 of any factual support of Stevens's bare assertion that he was denied overtime, the Court finds there is 17 no issue of fact on this point. *See FTC v. Publishing Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th 18 Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, 19 is insufficient to create a genuine issue of material fact.").

20 Although Stevens has provided evidence suggesting that he suffered adverse employment actions 21 between 2001 to 2003, the Court finds this insufficient to constitute a continuing violation. As an initial 22 matter, the actions are wholly separate, each occurring at least months apart from each other. In 23 addition, with respect to his transfer, the County has offered a wholly legitimate reason that Stevens has 24 not rebutted. Given that plaintiff has offered no evidence of pretext, and relies only upon inferences 25 stemming from the temporal proximity of the actions to his complaints, the Court finds that he has failed 26 to raise a genuine issue of material fact. The relatively minor nature of the complaints, the lack of any

---

[10] According to defendant, Stevens's time records from November 2001 are missing.

13

1  apparent connection between the complaints and the adverse employment actions, the legitimate
2  justification for the most significant employment action, and the infrequency with which the actions
3  occurred all lead this Court to conclude that the continuing violation doctrine should not apply. Thus,
4  defendant is also entitled to summary judgment on plaintiff's state law retaliation claim.

### III. Disparate Treatment

To establish a prima facie case for disparate treatment, plaintiff must prove: (1) he was a member of a protected class; (2) he was performing his job in a satisfactory manner, (3) he was subjected to adverse employment action; and (4) employees not in the protected class were not treated similarly. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998); *see also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000). The Court finds that plaintiff has not established a *prima facie* case of discrimination because he has not demonstrated that other employees were treated differently.

Plaintiff argues that he was discriminated against when he was transferred to Hillcrest following the altercation with Obiajulu. The only evidence plaintiff points to in support of his claim that other employees were treated differently is the hearsay statement that two younger, Caucasian individuals were assigned to his old position at Camp Glenwood. Even assuming that this evidence is admissible, it is insufficient to create a *prima facie* case. The two individuals plaintiff referred to were not assigned to his shifts on a permanent basis. *See* Peterson Decl., ¶ 13 ("Initially, after Mr. Stevens's incident with Mr. Obiajulu on April 10, 2002, his shifts were filled by miscellaneous (more than a dozen) different employees."). And it is undisputed that the man who eventually replaced Stevens was African American. *Id.* Plaintiff has pointed to no evidence that would establish his age.

Plaintiff has failed to make a *prima facie* case of disparate treatment based on race and age. Accordingly, defendant's motion for summary judgment is GRANTED as to those claims.

### IV. Family Leave Act Violations

Defendant argues that plaintiff cannot establish any cognizable damages for violation of the federal and state leave acts. As to plaintiff's claim for violation of the FMLA, the Court agrees.

14

Plaintiff has alleged only emotional harm in connection with his claim, *see* Second Am. Compl., ¶ 49, and has expressly disclaimed all economic damages for the alleged leave violations.[11]  Federal courts, however, have uniformly held that damages for emotional distress are not available in FMLA claims. *See, e.g.*, *Rodgers v. City of Des Moines*, 435 F.3d 904, 908-09 (8th Cir. 2006); *Brumbalough v. Camelot Care Ctrs., Inc.*, 427 F.3d 996 (6th Cir. 2005) (holding that emotional distress damages are unavailable under FMLA).  Thus, the Court GRANTS defendant's motion for summary judgment on plaintiff's FMLA claim.

     Evaluation of plaintiff's claims for emotional distress damages for violation of the CFRA is somewhat more difficult.  Both parties have discussed this case largely in terms of federal law.  Thus, neither party has provided the Court with a California case that has considered whether emotional distress damages are available for a violation of the CFRA.[12]  Although it appears unlikely to the Court that California would allow recovery of emotional distress damages for a violation of the CFRA given the close relation between the CFRA and the FMLA, the Court finds it preferable to leave this issue to the California courts in the first instance.  Thus, the Court declines to exercise supplemental jurisdiction over plaintiff's CFRA claim, and DISMISSES the claim for lack of subject matter jurisdiction.

///

---

[11] On November 4, 2005, the Court ordered the parties to provide supplemental briefing on the issue whether emotional distress damages are available for plaintiff's leave act claims. Plaintiff's response stated that plaintiff was not seeking any economic damages for the alleged leave act violations, and included essentially no argument that emotional distress damages were available.

[12] At least one California trial court has allowed damages for emotional distress based upon a violation of the CFRA. *See Dep't of Fair Employment & Housing v. Verizon Cal., Inc.*, 108 Cal App. 4th 160, 164 (Cal. App. 2003) (noting without comment that trial had awarded damages for lost pay and for emotional distress).

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS IN PART defendant's motion for summary judgment (Docket No. 60) and DISMISSES the remaining claim for lack of jurisdiction.

**IT IS SO ORDERED.**

Dated: March 6, 2006

SUSAN ILLSTON
United States District Judge